Cook versus New Castle Area School District. Head out. Mr. Solomon. Good morning, Your Honors. My name is Jonathan Solomon. I represent the appellant, Daniel Cook. After the last case, I'm a little overwhelmed. Go away. This case involves the conversation between a school janitor and a cafeteria lunch lady. Also, rady matters of national security. I don't mean to trivialize the issues, but I'm a little embarrassed after that. But it's an important matter to my client and his fellow employees. Our argument is that this casual conversation that was had between, as my client, who was off duty as a janitor, was strolling through the cafeteria early in the morning. They do serve the kids breakfast, and then they would be preparing for lunch. And he talked to a lady who he'd known all his life and a neighbor. And unfortunately, that was the day of the local elections, Election Day. And one of the ballots was for school board, and she asked Mr. Cook, who were the people up in Croton, which is part of the neighborhood, who are they for? And he said, well, we're supporting all the girls, and who were at that time opposition candidates to the incumbents. And she said, well, I'm supporting Freddie, who was president of the school board up for re-election. And after I leave here, I'm going to go to the polls to work for him. And my client responded, well, you've got to do what you have to do. And then he went on. About 11-ish, he is summoned or is contacted by the assistant principal, who tells him, Mr. Cook, that the president of the school board had called the assistant principal and instructed the assistant principal to tell Mr. Cook that he better stop talking about the election and who people are going to vote for, where it's going to affect, or I'm going to come up there and things will get ugly. We do concede that Mr. Cook was not disciplined for this. Help me right there. Doesn't that do this claim in? The cases are pretty clear that you have to have, for a First Amendment retaliation claim, you have to have harm sufficient to deter a person of ordinary firmness from supporting the candidate of his or her choice. And we have cases that say criticism and verbal reprimands are not enough. Doesn't this case end right there with one missing element of a First Amendment retaliation claim? Well, we say there's more, Your Honor, that in the middle of all this, Mr. Cook had applied for a new job in the parallel part of the janitor union maintenance, from janitorial to maintenance, and the job had been promised to a much more junior employee and my client had to file a grievance to get that job and that there was a grievance arbitration hearing and that the arbitrator found him to be competent for that job. And that within a week after this... And that this has something to do with this cafeteria conversation? Yes, we say that it does. And that within a week after that, he was given the job but imposed the 30-day probation, which the union took the position, and there's a letter from... The 30-day probationary period is prescribed in the CBA. Well, the union takes the position that because it was awarded by the tripartite arbitration that therefore the 30-day probation wasn't needed. I understand that's the position, but it isn't. It certainly isn't. So effectively, your position, or what you vindicated the union's position, is that there's almost some kind of preclusive force that goes with the arbitration determination of competency such that the probationary period is obviated. Right, right. But then that isn't all. Then there's the additional facts of that the supervisor, Mr. Felina, who is to evaluate Mr. Cook, admitted to two people in conversation that he was called into the superintendent's office and told that he must find Mr. Cook incompetent or not satisfactory for that position. And then we have the facts alleged. We have some affidavits. All this is because he said something in the cafeteria to a coworker. Well, it's a little bit more than that. It's also because he had the temerity to challenge the management's decision as to who this person would be for the maintenance job. Okay, and so what's... I don't understand. What's protected activity about that? Well, actually... What's that got to do with the cafeteria conversation and the First Amendment speech? Without that Election Day incident, it wouldn't, certainly. That would not have been a public issue. It's that he supported opponents of the majority board members, and this is not like the threats in the various cases cited by the school district where a superior, a supervisor says to somebody, well, I'm thinking about demoting you or I'm thinking about giving you an unfavorable assignment or something. That statement was more than, to the principle, tell this guy to shut up. I mean, it was a threat of physical menace. And the other part of our argument is that there was nothing said to the other party to the conversation. In other words, we aren't here, I'm not here arguing that the employees in the Newcastle School District have a right to be politicking and lollygalling, talking about the election all the time, anytime, and campaigning and buttonholing people, but that it was only our side, my client's side of the conversation that got this threat, not the other side. And therefore, we're saying that it's more than merely saying I want to chastise you. You can't talk that way. You can't talk about who you want to support, particularly if there are opponents, because the converse is if you talk that you want to support us, then that's okay. And I think that really is the crux of why the union is interested in this, is to get some clarity as to what can be said during the day. I mean, certainly it is the work day. And we don't have, in this case, a policy. Now, the school district has a policy, but it wasn't put into evidence, and it really isn't very helpful because it basically says employees shall not politic or do political campaigning during the day, and that doesn't really help, because the school district doesn't say that Mr. Cook violated that, and we're not attacking that policy. Actually, we've actually approached the school district that maybe we need a more detailed policy. And unfortunately, because of the personalities of the school board president, it's a little sensitive with the board. I must admit I'm still confused on what motivated and caused what. In parts of your brief, at times you seem to be saying that all this happened to Mr. Cook because he bid on a job intended for another and got it. That's what starts it, yes, Your Honor. That's the motivation. I don't see what your claim is because I don't think it's protected activity. You're absolutely right. At that point, that is not. It's that he then was chastised for expressing his opinion, support for opposition candidates later on. And which was it? Was it taking the job away from somebody who was favored, that motivated the work assignments that we haven't gotten to yet? Right. Right, and we don't have direct evidence of that. Nobody's going to say that. But we do have these statements of fellow employees who say that when I was in maintenance, I was given help for the first six months or whatever, things like that, which are fact. Matters of fact, not matters of law. Why do they? The evidence here is so thin, I don't understand. Nobody says what this work is. The principal said the only reference to what the work assignments were was changing lights. Everybody else doesn't say a word about what the work consisted of, how much time Mr. Cook was given to get this work all done by himself. And he doesn't say, his testimony, his deposition is there, but he doesn't even say anything about this work. Do we know anything? What do we know about this work? Well, we're at the summary judgment level. I submit that these are facts for the jury to decide. Mr. Felina gave a very eloquent explanation for the various tasks and his reasons, but I submit that that's not enough to decide that as a matter of law. But we can agree, the record, there's nothing that indicates that this was degrading labor or that this was not appropriate. It's not labor he would be not expected to do as a maintenance man. Certainly. No, there is no allegation, no evidence that it was degrading or inappropriate. It's just that that, coupled with the threats made to the supervisor, that you better find this guy incompetent than with the job assignments where he wasn't given assistance where others were. In other words, if you take- But we know that Mr. Felina did not yield to that pressure. No question, and much to his credit. That's true. At the end of the 30-day period, he found Mr. Cook to be incompetent. And there's no question. You'll hear from Mr. Smart. You might as well hear it from me. How could a reasonable fact finder on the record, the evidence your client has tendered, conclude that during these 30 days he was subjected to something that was so burdensome it would dissuade a person of reasonable firmness not to support the candidate of his or her choice? Well, that he was singled out, that he was given more difficult tasks, a person starting out in this position- More difficult tasks. Well, the point was is that certain of these, like the ballast with the lights, that other people starting out in this kind of a maintenance position had two people sent out instead of just one. That, coupled with the threats against Mr. Felina, would color those assignments. Mr. Solomon, in parts, not only through your argument today, but in the latter part of your brief, you seem to have been raising a hostile work environment claim. Yeah, I think that might be hyperbole a bit. Is it a claim or is it just a characterization? Just a characterization. Yeah, it's not really an element. So it's more a categorization? Yes, yes, yes. I don't mean to assert that there was a tremendous amount of hostility. He wasn't being yelled at. There were no inappropriate job assignments in that sense. There was nothing degrading. And needless to say, at this point, he has the job and he has not suffered any wage loss. That's true. Thank you very much, Mr. Solomon. Do you preserve time in the room? Yes. I may not even need it. Good morning, Your Honors. May it please the Court, John Smart on behalf of the school district and the individual defendants. Your Honors, I almost don't know where to start. I guess the beginning is the best spot. The district court found, and there's no dispute at this point, that the speech in question, which would be the conversation between Mr. Cook and the cafeteria lady, was definitely a matter of public concern and is protected speech. And then the district court applied the Pickering balancing test, and in so doing found that obviously the district's interest in providing a functional workplace outweighed Mr. Cook's interest in having such a conversation in the school cafeteria. It appears that appellants are saying that since the district court did not rely on or mention the fact that the cafeteria lady didn't receive the same threat, and I don't agree with the threat of physical manifestations, but she didn't receive the same threat, that somehow that belies the district's interest in maintaining a functional workplace. And it would somehow make his balancing test effective in some way. Your Honors, it's our position, number one, that issue was never before the district court with respect to whether or not she should have received the same threat as Mr. Cook. I would suggest to the court that that's probably the reason why it's not mentioned in the district court's opinion, because they were never asked to address that particular issue. I would suggest that even if they were, in balance, it still wouldn't tip the scales in favor of Mr. Cook's interest over and above the district's interest in maintaining this functional workplace. Your Honors, with respect to the job in question and the grievance, just so it's understood, the position in question, this maintenance job that Mr. Cook wanted to get and was promised to somebody else, that all happened when he was still supporting Mr. Mazzocco for school board. It was the fact that the job was given to somebody else which caused the rift, which now caused Mr. Cook to change his allegiance to other school board candidates. So all of that, the fact that another person got this job, preceded any of this. It had nothing to do with Mr. Cook's political activities or political speech that came into question. With respect to the 30-day probationary period, Judge Smith, you're correct. It's in the collective bargaining agreement. There's really no dispute that the language is there. The arbitrator found that he had provided evidence of competency. The 30-day probationary period, which no evidence that he was treated any differently than anyone else, the 30-day probationary period was to demonstrate that competency. Which is what happened here. At the end of the 30-day probationary period, despite these threats that supposedly Mr. Felina was receiving, and which he disputes, by the way, but assuming for the purposes of this argument that he in fact did receive those threats, he certainly didn't bend to them in any way. At the end of the 30-day probationary period, he found Mr. Cook to be competent and he awarded him the job, gave him a good evaluation. The same would be true with the assignment of the work. Your Honor, the tasks, in fact, were not demeaning. They were the tasks that typical maintenance men do. The issue was whether or not he was sent out by himself in retaliation. There is no evidence, even in any of the affidavits, that Mr. Felina did this in retaliation for his speech or his political activities. In fact, there is evidence that pressure was put upon Mr. Felina to make him, to set him up to lose the job. Right. If we accept those affidavits as... The fact finder put those two together. That is, the pressure on Felina, who was the decision-maker with respect to assignments, and the co-worker affidavits about extraordinary work assignments. Couldn't you put those together? Yeah. Your Honor, I think that he did, but what he found was, even in the affidavits themselves, assuming that they are correct, none of those affidavits connect that assignment, those work assignments, or the fact that other people didn't go out by themselves. That couldn't be connected to his political activity or his political speech. And, in fact, when Mr. Cook was asked point-blank, and it's in the record, why would Paul Felina retaliate against you, he couldn't recall. He said, well, I may have known at one time, but I don't know anymore. So, what was missing in that whole thing was the connect between those job assignments and the political activity or the political speech. Well, what motivated the... Isn't there evidence with respect to what motivated the pressure and threats on Felina? Felina denies it, Your Honor. So, he said he received no threats. So, there is no... In the affidavits that were supplied on behalf of Mr. Cook, I don't believe any one of them specifies why these assignments were being made to Mr. Cook. They were more along the lines of, well, I did that work, and I never had to do it by myself. What does the record show about threats to Mr. Felina? What's the evidence of that? You say Mr. Felina denies it. Yes. The evidence of the threats are the affidavits that were supplied by various individuals saying, I talked to Paul Felina, and Paul Felina told me he was threatened and there's pressure on him to find him incompetent. Despite those threats, assuming that they occurred, Felina didn't do what he was being threatened to do. He found him to be competent. And there's nothing in the record from which you could determine that the reason for that pressure and threats was his political activity. That's correct. That's not contained in any of the affidavits, and I believe that's what the district court cited to as well. You can't make that connection anywhere. That's really it, unless the court has any questions. Thank you. Thank you. Mr. Stone? Just the point is that in the realities of small town politics, no one is going to say I'm doing this because you voted for the wrong candidates. I submit that particularly the affidavit of the assistant high school principal that Mr. Felina talked to is that there's an overwhelming, not overwhelming,  why would the superintendent of schools be interested in whether or not this man with many years of seniority as a janitor now is in a maintenance position? Why is this so important? It's the same thing with why does the president of the school board care about what a janitor says to the lunch lady? Maybe because he took a job that somebody else thought somebody else should get. Also, it's the politics. To say that the proverbial smoking gun, I'm telling you, Mr. Felina, that you darn well better do this because Cook supported opposition candidates, we're never going to get that evidence. And I submit that the fact finder should be entitled to make that inference. Thank you. Thank you. Thank you very much, counsel. We'll take the matter.